T.C. Memo. 2006-271


UNITED STATES TAX COURT


BENNETT GEIGER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3289-05.                    Filed December 26, 2006.


<u>Frank R. Keasler, Jr.</u>, for petitioner.

<u>W. Benjamin McClendon</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent determined a deficiency in
petitioner's 2000 Federal Income tax of $159,008 and an accuracy-
related penalty of $31,802 pursuant to section 6662(a).[1]  The

---

[1]Unless otherwise noted, all section references are to the
Internal Revenue Code, as amended, and all Rule references are to
the Tax Court Rules of Practice and Procedure.

issues we must decide are: (1) Whether petitioner qualifies for a theft loss deduction pursuant to section 165(c) in excess of $5,586; (2) if petitioner is entitled to the deduction, whether it is properly claimed for taxable year 2000; and (3) whether petitioner is liable for the accuracy-related penalty pursuant to section 6662(a).

FINDINGS OF FACT

Some of the facts and certain exhibits have been stipulated. The parties' stipulations of facts are incorporated herein by reference and are found as facts. Petitioner resided in Jacksonville, Florida at the time the petition was filed.

Petitioner is the sole shareholder in Big Ben Tree Service, Inc. (BBTS), an S corporation. BBTS filed its Federal income tax return for taxable year 2000 on June 25, 2001, on which it claimed a theft of property held more than 1 year and valued at $1,645,986.

BBTS issued to petitioner a Schedule K-1, Shareholder's Share of Income, Credits, Deductions, etc., attached to its taxable year 2000 Federal income tax return, containing a loss amount of $1,645,986 from previous years for inclusion on petitioner's return. BBTS also deducted a loss item of $155,227 for the current year from Form 4797, Sales of Business Property, on its taxable year 2000 return. In attachments to their 2000 tax returns, both BBTS and petitioner alleged theft losses of:

$63,704 in 1991, $93,292 in 1992, zero in 1993, $97,908 in 1994, $167,085 in 1995, $259,292 in 1996, $275,506 in 1997, $355,273 in 1998, and $333,926 in 1999. All the alleged theft losses were first discovered and therefore deducted in 2000.

Petitioner timely filed his Federal income tax return for taxable year 2000. On that return, he reported a loss of $1,645,986, income of negative $1,317,719, and a tax liability of zero.

Petitioner filed a Form 1045, Application for Tentative Refund (refund request), dated May 17, 2001, which was received by the Internal Revenue Service (IRS) on May 21, 2001. On the refund request, petitioner claimed an embezzlement loss of $1,801,213. Respondent refunded petitioner $120,933 for taxable year 1999, $99,816 for taxable year 1998, and $150,243 for taxable year 1997.

After examination of his return by the IRS, petitioner conceded that the amount of the theft loss for taxable year 2000 should be reduced by $1,096,713 to $704,500. As a result of that reduction, petitioner remitted to the IRS the refunds previously received, plus interest, for taxable years 1997, 1998, and 1999.

On November 15, 2004, respondent issued a notice of deficiency, determining that petitioner failed to substantiate a theft loss deduction for taxable year 2000 of $1,645,986. In the notice, respondent also determined that petitioner failed to

substantiate $149,641 of theft loss for taxable year 2000 and, accordingly, allowed a theft loss of $5,586.  Additionally, respondent determined that petitioner was liable for an accuracy-related penalty pursuant to section 6662.

Petitioner cannot identify specific checks whose amounts add up to the $704,500 allegedly embezzled from BBTS.  Additionally, petitioner cannot identify checks whose amounts add up to the $1,096,713 originally claimed as part of the embezzlement, which was later identified as previously deducted business expenses. Petitioner did list, in an exhibit attached to petitioner's answers to respondent's interrogatories, checks totaling $1,232,602.69 as allegedly embezzled.

Petitioner provided respondent with copies of some, but not all, of the listed checks.  Petitioner did not provide source documents to the examining agent during the course of the audit. Petitioner did not maintain the source documents underlying the general ledgers of BBTS.

At trial, petitioner further reduced the claimed theft loss by $139,789 to $564,711.  Petitioner also conceded that all checks in the amount of $1,500 were not embezzled, but did not further change the total amount of theft claimed.

Leslie Clark (Ms. Clark) and Ann Ellis (Ms. Ellis) are two former employees of BBTS who petitioner alleges embezzled funds from BBTS.  Ms. Clark worked for BBTS while married to petitioner

from 1980 until 1990. Ms. Clark was again employed at BBTS from 1995 until the summer of 1999. During the latter period of employment, Ms. Clark and petitioner were engaged in an extramarital relationship, including while petitioner was married to Carrie White (Ms. White) and Ms. Clark was married to Ted Clark.

Ms. Ellis began working for BBTS in 1988, left employment in 1990, and returned to BBTS in 1991 and continued to work there until January 2001, when her employment was terminated. Ms. Ellis was responsible for bookkeeping and accounting. Ms. Ellis had signatory authority over BBTS's corporate checking account. She also signed payroll checks on behalf of BBTS during the period of the alleged embezzlement. Ms. Ellis paid petitioner's personal bills, such as telephone, power, etc., from BBTS and charged the amounts as shareholder distributions.

Ms. Ellis and Ms. Clark provided petitioner with operating cash from BBTS's corporate accounts at least weekly, except for the periods when petitioner was on vacation or engaged in vocational training. The cash was provided to petitioner by Ms. Ellis's writing a check to petitioner and endorsing it. Then, she or Ms. Clark would cash the check and either deliver the cash to petitioner or leave it in his office desk. Petitioner used the cash for expenses (cash expenses) incurred in the field, including but not limited to, maintenance and repairs to trucks

and equipment, fuel, and dump fees.[2]  Each week, the cash expenses regularly totaled between $5,000 and $6,000.[3]

Petitioner received all the cash he used for personal spending money in the same manner as the cash he received for cash expenses; i.e., by having Ms. Ellis cash a check from BBTS and deliver the money to him.  Petitioner did not use ATM cards and could not withdraw currency directly from his personal accounts.

During the IRS's examination of petitioner's return, Ms. Clark and Ms. Ellis each signed an affidavit on July 8, 2002 (affidavit).  The affidavits each stated that the respective affiant did not embezzle any money from BBTS or petitioner.

Ms. White began working for BBTS in August 1999.  Petitioner and Ms. White were married during November 2000.  Ms. White, on petitioner's behalf, investigated BBTS's alleged theft loss.  Ms. White does not have any bookkeeping training or experience either in general or with the specific accounting software BBTS used.  Ms. White prepared an analysis of the alleged theft loss at BBTS.  Although Ms. White could not distinguish an embezzled check from a nonembezzled one, the original analysis she prepared claimed

---

[2]Dump fees are fees paid by petitioner to dispose of the wood removed from a customer's property, as petitioner was not allowed to leave the debris from a customer's job for regular garbage collection.

[3]For example, BBTS deducted $111,600 in dumping fees alone in 1997, $133,330 in 1998, $204,588 in 1999, and $43,934 in 2000.

every check written to petitioner was embezzled, resulting in the $1,801,213 total originally claimed in the refund request.

On January 24, 2001, Ms. White filed a police report with the Jacksonville Sheriff's Office. The police report did not mention a sizable embezzlement loss.[4] The police report is the only report petitioner filed with law enforcement officials with respect to the claimed theft loss.

Although petitioner and Ms. White have divorced since the discovery of the alleged embezzlement, petitioner occasionally sends Ms. White money. Petitioner gave Ms. White $1,000 for her travel expenses from Pensacola to Jacksonville to testify at the trial in the instant case. Petitioner also gave Ms. White $500 2 weeks prior to the $1,000 gift.

During 2001, petitioner filed a civil action against Ms. Clark and Ms. Ellis seeking damages for the amount of the theft loss. Petitioner entered into a settlement agreement with Ms. Ellis and Ms. Clark on January 9, 2003, that required them to pay petitioner $12,000 each. Ms. Ellis discharged her liability under the settlement in a chapter 7 bankruptcy. On February 14, 2006, petitioner filed against Ms. Clark a motion for final

---

[4]The police report claims the theft of personal property, mostly tools and office equipment. Ms. White testified at trial that "Some of those things have since been found." The only mention of checks is in the "Additional Information" section after the enumeration of stolen items.

judgment in the Circuit Court for the Fourth Judicial Circuit of the State of Florida seeking $2,067,926.87 in damages.[5]

During the period of the alleged embezzlement, Ms. Clark continued to use her credit card for personal purchases and accumulated an unpaid balance of $10,000. Ms. Clark did not provide an explanation of how that credit card debt was consistent with her admission to the embezzlement of several thousand dollars per week from BBTS.

Ms. Clark maintained, until she met with respondent's counsel on March 14, 2006, that she did not embezzle any money from BBTS or petitioner. In February 2006, petitioner threatened Ms. Clark, who had recently applied for a real estate license, that, if at the trial of the instant case she did not admit to embezzling from BBTS, he would take out an ad in the newspaper calling her a liar and thief.[6] Ms. Clark did not admit to the alleged embezzlement on her application for a real estate license. Ms. Clark, before testifying at trial, received legal advice from petitioner's attorney regarding the statutes of

---

[5]We note that this roughly coincides with the timing of petitioner's threat to Ms. Clark, see infra, and may have been an attempt to influence her testimony in the instant case. Ms. Clark had not made a payment under the agreement since May 18, 2004, yet petitioner waited almost 2 years to file for a judgment. Additionally, Ms. Ellis received a threatening phone call 2 weeks before trial, although the identity of the caller is not in evidence.

[6]Petitioner intended to intimidate Ms. Clark with the threat of losing her license or future business.

limitations for criminal prosecution, as well as assessment of taxes and penalties against her for substantial understatement.

Notwithstanding her prior denials, Ms. Clark testified at trial that she and Ms. Ellis embezzled money from BBTS. Ms. Clark's testimony, however, did not provide even a general amount of money that she allegedly embezzled, nor could she reconstruct an amount by linking any specific items purchased with allegedly embezzled funds.

Ms. Clark claimed that Ms. Ellis invited her to join an ongoing embezzlement scheme shortly after Ms. Clark resumed working at BBTS. Ms. Ellis was aware that Ms. Clark was petitioner's former wife and that Ms. Clark and petitioner were engaged in a personal relationship at the time.

Ms. Clark's then husband, Ted Clark, supposedly knew of Ms. Clark's embezzlement. Ted Clark did not testify at the trial.

## OPINION

As a general rule, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving otherwise. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Section 7491(a)(1) provides that the burden of proof will shift to the Commissioner when the taxpayer has introduced credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax. However, the burden of proof does not shift to the Commissioner unless the

taxpayer complied with all substantiation requirements, maintained all required records, and cooperated with reasonable requests by the Service "for witnesses, information, documents, meetings, and interviews". Sec. 7491(a)(2); <u>Higbee v. Commissioner</u>, 116 T.C. 438, 440-441 (2001). Section 7491(c) provides that the Commissioner shall have the burden of production with respect to any penalty. See also <u>Higbee v. Commissioner</u>, <u>supra</u> at 446-447.

A taxpayer who provides only self-serving testimony and inconclusive documentation is not considered to have provided credible evidence. See <u>Blodgett v. Commissioner</u>, 394 F.3d 1030 (8th Cir. 2005) affg., T.C. Memo. 2003-212; <u>Higbee v. Commissioner</u>, <u>supra</u> at 445-446.

Credible evidence is evidence that, "after critical analysis, the Court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted". <u>Higbee v. Commissioner</u>, <u>supra</u> at 442 (citing H. Conf. Rept. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995). Evidence is not credible if the Court is not convinced that it is worthy of belief. <u>Id.</u>

On the basis of the record before us, we conclude that petitioner did not introduce credible evidence with respect to the factual issues presented under section 165. Petitioner provided only incomplete and inconclusive documentation, along

with self-serving and incredible testimony.  Because petitioner
did not introduce credible evidence with respect to those factual
issues, the burden of proof does not shift to respondent under
section 7491(a)(1).[7]  Accordingly, we need not decide whether
petitioner has complied with the applicable requirements of
section 7491(a)(2).  The burden of proof rests with petitioner to
prove that he qualifies for a theft loss deduction in excess of
the amount respondent allowed in the notice of deficiency.

Section 165(a) allows a deduction for "any loss sustained
during the taxable year and not compensated for by insurance or
otherwise."  Concerning theft losses, section 165(a) is
applicable for the year "in which the taxpayer discovers such
loss."  Sec. 165(e).  For purposes of section 165(e), theft
includes embezzlement.  Sec. 1.165-8(d), Income Tax Regs.

To carry his burden, petitioner must establish that the
alleged theft loss occurred and that the requirements of section
165 have been met.  See Allen v. Commissioner, 16 T.C. 163, 166-
167 (1951).  Petitioner must establish, inter alia, the existence
of a theft within the meaning of section 165 and the amount of
the claimed theft loss.  See Elliott v. Commissioner, 40 T.C.
304, 311 (1963).  Whether certain actions constitute theft for

---

[7]We note that, although the burden of proof did not shift,
respondent did produce a full source and applications analysis of
petitioner's business and personal income.  The analysis shows no
missing funds.

purposes of section 165 depends on the law defining the crime of theft in the jurisdiction where the alleged theft occurred. Monteleone v. Commissioner, 34 T.C. 688, 692 (1960).

Fla. Stat. Ann. sec. 812.014 (West 2000) provides:

(1) A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:

(a) Deprive the other person of a right to the property or a benefit from the property.

(b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.

In the instant case, petitioner has failed to prove that a theft occurred under Florida law. Despite producing, as multiple exhibits at trial and on brief, several lists of checks from BBTS,[8] including those in response to respondent's interrogatories, petitioner has not provided the Court with any credible documentation that supports a theft in the total amount of $1,801,213, $704,500, or $564,711.[9]

---

[8]We note that several of these lists include information about checks that are not a part of the record and are not in evidence.

[9]For example, petitioner's reply brief includes three lists of checks. The list entitled "TOTAL Theft Loss" includes 427 checks with a total amount of $909,449.66. There is a "TOTAL DOUBLE DATED CHECKS" list for each of the years 1996-2000, which lists cumulatively include 275 checks totaling $593,940.76. The list entitled "Missing Check Total Amount" includes 348 checks totaling $762,810.34.

Petitioner argues that reasonable inferences support the conclusion that there was an embezzlement case and that such inferences are sufficient to support a decision in his favor. Petitioner cites Moore v. Commissioner, T.C. Memo. 1983-671, for the proposition that a court may rely on reasonable inferences in an embezzlement case. In fact, the actual holding in that case is that the Court will not make or rely upon assumptions without some basis in the evidence. The taxpayer in Moore, like petitioner, failed to produce sufficient evidence to raise his claim of embezzlement from a bare assumption to a reasonable inference. Moore also fails to support petitioner's position in that the existence and amount of money missing in Moore were not in issue, only the characterization of the money as stolen from the taxpayer versus misappropriated from a partnership. On the basis of the record, we conclude that petitioner has not provided sufficient credible evidence to support a reasonable inference of embezzlement.

Petitioner further argues that, after inferring that some money was embezzled, the Court can now estimate the amount of loss. Petitioner cites Mann v. Commissioner, T.C. Memo 1981-684, for the proposition that the Court may estimate an embezzlement loss, applying the rule of Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Although Mann did involve both an embezzlement and an estimation, there was no estimation of an embezzlement.

In Mann, a secretary embezzled money from the taxpayer by forging checks. The embezzlement portion of the opinion does not deal with the amount of embezzlement by the secretary at all, only the proper year of deductibility. The taxpayer in Mann also was the victim of theft by a business partner. The taxpayer had given a business partner $10,200 to open a store. The partner did open a store, but shortly thereafter closed it and absconded with the remaining capital. Using the Cohan rule, the Court estimated that $5,000 of the $10,200 had been embezzled and allowed ordinary loss treatment for that amount. The Court ruled that the rest of the loss was a capital loss resulting from the failure of the store. The Court clearly stated: "Neither the fact that petitioner sustained a loss nor the amount of such loss is in dispute." Id. In the light of the lack of credible evidence to support the conclusion that there was an embezzlement in any amount, we decline to apply Mann and Cohan in the instant case.

We find unconvincing petitioner's contention that any time more than one check was written to petitioner during any particular day, there must have been embezzlement. Given petitioner's extensive use of cash for business expenses and commingling of personal funds and expenses with those of BBTS, petitioner's bare assertions regarding the number of checks in a day is insufficient to prove theft.

Moreover, Ms. Clark's testimony lacks credibility. For years, Ms. Clark maintained that she did not embezzle from BBTS, including in an affidavit and on her application for a real estate license. Furthermore, during February 2006, petitioner threatened Ms. Clark with libel, after which she first admitted to the embezzlement. Additionally, Ms. Clark's admission to the embezzlement during the testimony at trial was made after receiving legal advice from petitioner's counsel that she could no longer be prosecuted criminally or be liable for additional taxes from the alleged embezzlement. Also at trial, Ms. Clark could not explain why she continued to carry a credit card balance while allegedly embezzling from BBTS. Likewise, she did not provide convincing testimony regarding the amount of the embezzlement or what she did with the money. Finally, it is implausible to us that Ms. Ellis would recruit Ms. Clark to embezzle from BBTS, knowing Ms. Clark was formerly married to petitioner and was in a relationship with him at the time. On the basis of the record, we hold that petitioner has failed to prove that he is entitled to any embezzlement deduction beyond the amount respondent allowed in the notice of deficiency.

Because petitioner failed to prove that a theft loss in excess of $5,586 occurred,[10] we do not reach the question of timing.

Section 7491(c) provides that the Commissioner bears the burden of production with respect to the liability of any individual for any addition to tax or penalty.  Consequently, respondent must produce sufficient evidence to demonstrate that the accuracy-related penalty is appropriate.  See Higbee v. Commissioner, 116 T.C. at 446.

Section 6662(a) imposes a 20-percent accuracy-related penalty with respect to the portion of any underpayment of tax attributable to a substantial understatement of income tax.  An "understatement" is the excess of the amount of tax required to be shown on the return over the amount of tax that is actually shown on the return.  Sec. 6662(d)(2)(A).  A "substantial understatement" of income tax exists if the amount of the understatement for the taxable year exceeds the greater of (1) 10 percent of the tax required to be shown on the return or (2) $5,000.  Sec. 6662(d)(1)(A).

On his return, petitioner indicated a tax liability of zero. Respondent determined the appropriate tax was $159,008.  The

---

[10]Although the evidence at trial suggests that no theft at all occurred, on brief respondent has maintained the same position as taken in the notice of deficiency and does not seek to disallow the deduction allowed in the notice of deficiency.

difference between $159,008 and zero exceeds both 10 percent of $159,008, or $1,590, and $5,000. Accordingly, the understatement was substantial.

Section 6664(c)(1) provides that the accuracy-related penalty shall not apply to any portion of an underpayment if it is shown that there was reasonable cause for the taxpayer's position with respect to that portion and that the taxpayer acted in good faith with respect to that portion. The determination of whether a taxpayer acted with reasonable cause and in good faith within the meaning of section 6664(c)(1) is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's effort to assess his proper tax liability for the year. Id. "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Id.

Petitioner does not qualify for section 6664(c)(1) relief. Under the circumstances, petitioner's failure to consult an accountant or other tax professional was unreasonable. See Marr v. Commissioner, T.C. Memo. 1995-250 (finding taxpayer negligent for claiming theft loss without consulting tax professional). Petitioner claimed a very large deduction that resulted in

claiming zero tax liability for the current year and refunds for several prior years.  Petitioner did not consult an accountant to prepare the loss but rather relied on his then wife, Ms. White, who has no experience in bookkeeping.  Ms. White's analysis yielded a total of $1,801,213.  However, once consulted, petitioner's accountant quickly reduced that amount to $704,500.  Accordingly, petitioner does not qualify for the reasonable cause exception in section 6664(c)(1), and we hold that petitioner is liable for the penalty pursuant to section 6662 for a substantial understatement of income tax.

We have considered all of petitioner's contentions, and, to the extent they are not discussed herein, they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.